IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TRAVIS WESTON, #M07414, <br><br>       **Plaintiff,** <br><br> v. <br><br> JOHN BALDWIN, <br> JACQUELINE LASHBROOK, <br> FRANK LAWRENCE, <br> LLOYD HANNA, <br> HOWARD HARNER, and <br> JAMES CLAYCOMB, <br><br>       **Defendants.** | Case No. 19-cv-01020-NJR |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

      Travis Weston, an inmate of the Illinois Department of Corrections ("IDOC") currently incarcerated at Menard Correctional Center ("Menard"), commenced this action by filing a Complaint pursuant to 42 U.S.C. § 1983. The Complaint and Supplemental Complaint allege violations of the First Amendment and Religious Land Use and Institutionalized Persons Act ("RLUIPA") by Defendants for (1) prohibiting Weston from praying in accordance with his religious faith; (2) denying him participation in religious services and observances; (3) denying him a diet in compliance with his religious dietary restrictions; (4) implementing policies and practices that burden his practice of religion; and (5) retaliation. (Docs. 1, 50).

      On December 27, 2019, Weston filed a motion for preliminary injunction. (Doc. 29). He requests the Court to order Defendants to (1) restore his kosher diet, as it was before

it was sabotaged and terminated; (2) allow him to participate in the work program and be assigned to the law library as a clerk; and (3) restore his telephone and email privileges. (Doc. 29, p. 11). The Court deferred ruling on the injunction motion to the extent that Weston alleges denial of a diet in compliance with his religious dietary restrictions and retaliation by staff. (Doc. 49, p. 15, Doc. 57, p. 5).[1] Defendants filed a response to the motion on January 17, 2020, and the Court held a hearing on the motion on July 29, 2020.

## ARGUMENTS

### I. Weston

In the Complaint, Supplemental Complaint, and Preliminary Injunction Motion, Weston alleges he is devout Muslim, and according to the dietary laws of the Islamic faith, there are certain foods that are forbidden to eat. (Doc. 29, p. 1-2). He was approved to be provided a kosher diet, but Defendant Hanna, the food services program manager, purposefully diminished the nutritional value of the breakfast tray by removing the packaged peanut butter.[2] (*Id.* at p. 3). Hanna also placed nonkosher items, such as boiled eggs and texture vegetable protein ("TVP"), on his tray that had been prepared using the same pots, pans, and other utensils used to cook nonkosher food in the kitchen. (*Id.*). Weston wrote a grievance, but Hanna, without consulting a religious leader, told the grievance officer that the boiled eggs and TVP were kosher certified. (*Id.* at p. 3-4). Weston

---

[1] The Court initially denied Weston's request for an injunction to the extent he was requesting reinstatement in the work program and restoration of telephone and email privileges. (Doc. 49, p. 14-15). In its Order granting in part Weston's motion for reconsideration, however, the Court stated it would consider his claims of retaliation by staff at the preliminary injunction hearing. (Doc. 57, p. 5).
[2] Weston claims that the Kosher breakfast had previously contained cereal, packaged peanut butter, jelly, crackers, two apples, and powder milk. (Doc. 29, p. 3).

then stopped eating the breakfast tray altogether and started trading kosher and halal items with other inmates, which is prohibited by IDOC regulations. On June 19, 2019, he received a notice from Defendant Claycomb, the chaplain, that his kosher diet was being terminated because he had violated the terms of the contact by purchasing nonkosher items from the commissary. (*Id.* at p. 4). Weston states that at the Menard commissary there is no way of knowing which food items are halal or kosher certified until after the item is purchased. (*Id.* at p. 3). Weston attempted to maintain his halal diet by trading with other inmates and through the purchase of commissary items but eventually ate prohibited food served in the inmates' kitchen from time to time. (*Id.* at p. 4-5). Chaplain Claycomb presented Weston with a new kosher diet contract on January 10, 2020, but Weston refused to sign it because the list of permitted food items that could be purchased from the commissary did not include certain halal certified products. He continues to not receive halal or the alternative kosher diet trays. (*Id.* at p. 7).

Following the filing of this lawsuit, Weston further alleges he has been subjected to retaliation by staff at Menard. He has been removed from his job in food services and barred from receiving a new job assignment, his telephone and email privileges were suspended, and he was reassigned from a single cell for inmates with job assignments to a small dirty cell with a cellmate. (*Id.* at p. 7, 10; Doc. 50, p. 5, 9).

II.     *Defendants*

Defendants first argue that Weston has failed to demonstrate reasonable likelihood on the merits of his claims. They assert that on April 18, 2017, the warden and chief chaplain approved Weston's Offender Request for Religious Diet form. (*Id.* at p. 4).

The form includes language informing inmates they are prohibited from purchasing any food items not part of the religious diet and are prohibited from exchanging or giving away any religious diet food or tray and from accepting or trading food from a tray other than their approved diet tray. (*Id.*). Hanna, as food services program manager, reviews commissary orders of inmates on kosher religious diets and found twenty-eight violations on Weston's commissary orders from February 13, 2019, through May 22, 2019. (*Id.* at p. 5). Weston was involuntarily removed from his kosher diet per an incident report citing the twenty-eight violations. Weston was informed in writing that he could reapply to have his diet reinstated no sooner than sixty days from the date of the discontinuation. To date, Weston has not submitted a request to have his kosher diet reinstated. (*Id.*). Defendants argue that IDOC has legitimate concerns in maintaining orderly administration of the dietary system and requiring inmates to submit a request for religious diet is not a substantial burden on an inmate's religious exercise. (*Id.* at pp. 4, 6) (citing *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005)).

Defendants further argue that there is also no merit to Weston's claim that Hanna's actions substantially burdened the exercise of his religion by removing the peanut butter from the kosher tray and serving nonkosher items. Defendant Hanna claims he is not involved in deciding what items are made part of the kosher religious diet, which is decided by the State of Illinois. (*Id.* at p. 8; Doc. 34-4, p. 1). A kosher religious diet is a prepackaged meal that is sealed. (Doc. 34-4, p. 1). Hanna states in his declaration that boiled eggs and TVP have been approved as kosher and replaced peanut butter on the menu five days of the week. Peanut butter is now only served on Wednesdays and

Saturdays for breakfast only. (Doc. 34-4, p. 2). All kosher trays are prepared in a special diet room of the facility's kitchen. Hanna states that "kosher diet items are not cooked. If any kosher item requires heating, the items are heated while sealed." (*Id.*). Eggs are boiled using utensils marked KOSHER, washed separately, and do not have contact with nonkosher food items. (*Id.*). The TVP is prepared by adding water. Defendants argue that Weston's concern regarding the absence of peanut butter on every kosher breakfast tray and being replaced with boiled eggs and TVP, appears to be an inmate preference and not a violation under RLUIPA. (Doc. 34, p. 8.). They state that Weston's allegations are unfounded and insufficient to establish that there has been any substantial burden on his ability to exercise his religion by Defendants. (*Id.*).

Defendants also claim that Weston cannot demonstrate a likelihood of success on the merits of his retaliation claim against Hanna for firing him from his work assignment in the kitchen in retaliation for filing this lawsuit. (*Id.* at p. 9). Hanna states that once it was confirmed that Weston had been assigned to food services, Hanna made a request to have Weston removed and placed in another department. (Doc. 34-4, p. 3-4). Because there is constant interaction between the food services manager and the individuals assigned to work in food services, Hanna states he did not believe it was a good idea for the two to work together five days a week while Weston had a lawsuit pending against him. (*Id.*).

Normally upon an inmate's removal from job placement, the supervisor is to complete an evaluation explaining why the inmate needed to be removed and any reason why the inmate should be restricted from new placement. Hanna did not complete any

evaluation, and therefore, Weston should be able to receive a new job placement. (*Id.*). Hanna asserts he has no role in the job placement process, and Weston would need to follow the procedures for new placement. There is no indication that Weston has properly requested to be reassigned as a clerk in the law library, which is his preferred assignment, or that he is being restricted from job placement at Menard. Furthermore, Weston's claim that his ability to contact his family by telephone and email was suspended in retaliation is unmerited. Defendants claim that access to the telephone and email is determined by an inmate's letter grade and whether the inmate has purchased minutes through the commissary. (Doc. 34, p. 10).

Second, Defendants argue that the motion should be denied because Weston cannot demonstrate irreparable harm. (Doc. 34, pp. 12). Chaplain Claycomb states in his declaration that on January 10, 2020, he informed Weston that Weston had been eligible since of August 17, 2019, for religious diet reinstatement. (Doc. 34-6, p. 3). Claycomb presented an Offender Request for Religious Diet form to Weston and informed Weston that if Weston signed the form then he would facilitate its approval with the warden. (*Id.*). Claycomb states that Weston replied "No, let's just wait and see what the judge says." (*Id.*). Defendants argue that Weston has not been provided a religious diet because he has not submitted a request for such accommodation. Weston has not followed prison procedures in order to obtain not only accommodation for his religious diet needs, but also for a job placement as a clerk in the law library, and now he asks for relief from the Court. As such, Defendants argue that any alleged harm that he will suffer is not due to their conduct, but his. (Doc. 34, p. 12).

## ANALYSIS

A preliminary injunction is an "extraordinary and drastic remedy" for which there must be a "clear showing" that a plaintiff is entitled to relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A CHARLES ALAN WRIGHT, ARTHUR R MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948 (5th ed. 1995)). The purpose of such an injunction is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Faheem-El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988). A plaintiff has the burden of demonstrating:

- a reasonable likelihood of success on the merits;
- no adequate remedy at law; and
- irreparable harm absent the injunction.

*Planned Parenthood v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 972 (7th Cir. 2012). As to the first hurdle, the Court must determine whether "plaintiff has any likelihood of success—in other words, a greater than negligible chance of winning." *AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002). Once a plaintiff has met his burden, the Court must weigh "the balance of harm to the parties if the injunction is granted or denied and also evaluate the effect of an injunction on the public interest." *Id.*; *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013). "This equitable balancing proceeds on a sliding-scale analysis; the greater the likelihood of success of the merits, the less heavily the balance of harms must tip in the moving party's favor." *Korte*, 735 F.3d at 665. In addition, the Prison Litigation Reform Act provides that a preliminary injunction must be "narrowly drawn, extend no further than necessary to correct the harm . . . ," and "be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). Finally,

pursuant to Federal Rule of Civil Procedure 65(d)(2), a preliminary injunction would bind only the parties, their officers or agents, or persons in active concert with the parties or their agents.

The Court finds that Weston is not entitled to a preliminary injunction at this time, as he has not demonstrated a likelihood of success on the merits as to his free exercise and RLUIPA claims and has failed to show that traditional legal remedies are inadequate and that he will suffer irreparable harm absent a Court ordered injunction as to his retaliation claim.

### I.     First Amendment/RLUIPA

Both the First Amendment and RLUIPA prohibit a prison from substantially burdening a sincerely held religious belief of an inmate. *See Koger v. Bryan*, 523 F.3d 789, 796, 802 (7th Cir. 2008). In the context of First Amendment and RLUIPA cases, "the likelihood of success on the merits is usually the decisive factor" in deciding a motion for preliminary injunction. *Wis. Right to Life, Inc., v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014).

At the hearing, Weston testified that he is requesting to have his kosher diet tray reinstated as it was prior to the replacement of the peanut butter with TVP and a boiled egg. Weston alleged that the TVP and boiled eggs are not properly prepared and stored according to the tenants of his faith, which require separate dishes to be used in preparing certain food to prevent cross contamination. He argued that because the peanut butter is prepackaged it is not suspectable to contamination, as it does not require further preparation in the Menard kitchen. In support of his allegation, he submitted an affidavit from another inmate at Menard, Jonathan Tolliver, who states that on September 19, 2019,

while working in the kitchen, he witnessed pots, pans, and utensils used for special diet trays being cleaned with the rest of the cooking items, and they were not labeled. (Doc. 68, 5). Tolliver further states in his affidavit that on that day there were not any food supervisors around and the supervisors provided little guidance or instruction. (*Id.* at p. 3). This sole affidavit, however, is not sufficient evidence to demonstrate a likelihood of success on the merits of a RLUIPA or First Amendment claim. A fellow inmate witnessing other inmates, who were not properly supervised, failing to follow dietary procedures when cleaning special diet kitchen equipment in September 2019, does not support Weston's claim that Claycomb and Hanna intentionally sabotaged his breakfast tray by serving nonkosher TVP and boiled eggs in 2018 and then terminated his kosher diet tray in June 2019. Weston has also not presented any evidence to show that Hanna had any involvement in or is authorized to select which food items are permissible for a kosher diet tray.

Furthermore, Weston has not demonstrated that Defendants have imposed a substantial burden by requiring him to adhere to the religious diet guidelines in order to obtain a kosher tray. Once his kosher diet tray was terminated, Weston does not allege that he has been denied the opportunity to reapply to receive the kosher diet or that his Offender Request for Religious Diet form was submitted and then denied. Rather, he testified that when presented with a new dietary contract he did not sign it because certain halal items that he would like to purchase at the commissary are not on the approved list. (*See* Doc. 68, p. 20-21). Weston argued that he must eat halal items to adhere to his faith. Weston testified, however, that there are items on the approved list that he

may purchase from the commissary that are both halal and kosher, and there is nothing in the record to demonstrate that he is or would be prohibited from eating the approved halal items on the list. He may want to purchase specific additional items from the commissary, but the inability to do so does not mean he is unable to follow his religion.

Accordingly, Weston has not shown a likelihood of success on the merits of his First Amendment and RLUIPA claim relating to his religious diet, and the Court need not discuss the other requirements necessary for a preliminary injunction.

I.      *Retaliation*

At the hearing, Weston testified that in February he submitted a new contact form, and his contacts were restored. Since that time, he has been able to email and make calls to outside family and friends. Thus, his request for injunctive relief regarding his email and telephone privileges is moot.

As to the termination from his job, many of those facts remain in dispute. Hanna claims that he called the placement officer to have Weston removed from the food services program and reassigned but states he does not have a role in job placement at Menard. Defendants did not provide an explanation for why Menard staff did not reassign Weston to a new job, and he still is not working. There is also a factual dispute over whether an evaluation was written by Hanna after Weston was removed from his job. Weston alleges that he was informed by a counselor that an evaluation was written and that the evaluation states that Weston did not want to work. (*See* Doc. 68, p. 10). Because of this negative evaluation, Weston states he was told he could not apply for another job for six months and once that period was over it was unlikely that he would

receive another placement. Weston testified that the counselor told him she could not provide him with a copy of the evaluation. Defendants state that there are no documents relating to Weston's termination or reassignment, and Hanna claims he did not write an evaluation indicating that Weston should be restricted from new placement.

To establish a claim of First Amendment retaliation, a plaintiff must allege that: (1) his speech was constitutionally protected; (2) he suffered a deprivation likely to deter free speech; and (3) his speech was a factor motivating the deprivation. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). Weston is engaged in First Amendment activity in litigating this case, he claims he was terminated from his job and barred from further employment because he filed this lawsuit, and Hanna's declaration supports Weston's allegation that the lawsuit was a motivating factor in having him terminated from food services. Keeping in mind that that the threshold for establishing likelihood of success is low, Weston has shown a "better than negligible" chance of succeeding on the merits of his retaliation claim against Hanna. *Valencia v. City of Springfield, Ill.*, 883 F.3d 959, 966 (7th Cir. 2018) (citations omitted). *But see Douglas v. Reeves,* 964 F.3d 643 (7th Cir. 2020) (stating that to show deprivation in a retaliation claim against prison staff for job reassignment a prisoner needs to demonstrate more than subjective discontent in the new job assignment).

The Court finds, however, that traditional legal remedies, such as money damages or injunctive relief at final judgment, are adequate. *See Abbott Lab. v. Mead Johnson & Co,* 971 F.2d 6, 16 (7th Cir.1992). At the hearing, Weston claimed that a traditional remedy is inadequate because the damages cannot be calculated. But any wages lost by not

working while the litigation is pending may be calculated at the end of the case. *See Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840, 845 (7th Cir. 2005). A final determination on the merits thus provides an adequate remedy at law.

Weston also has failed to show irreparable harm. He argues that without an injunction restoring his job, IDOC officials will continue to retaliate against him, which would deter him from continuing to exercise his First Amendment rights.[3] (Doc. 55, p. 14-15). Weston has not attempted to apply for job placement or demonstrated he is being prohibited from securing a new job, so at this point, the fear of further retaliation is speculative. *See Wright v. Miller*, 561 F. App'x 551, 554 (7th Cir. 2014). Accordingly, Weston has not made the clear showing necessary to warrant this drastic remedy.

## DISPOSITION

For the reasons set forth above, the Motion for Preliminary Injunction (Doc. 29) is **DENIED without prejudice.**

**IT IS SO ORDERED.**

DATED:   July 31, 2020

*[signature: Nancy J. Rosenstengel]*

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**

---

[3] At the hearing, Weston made the arguments that by denying him job placement in the law library, other prisoners do not have meaningful access to help with their legal issues. The Court informed him again that he is only entitled to assert his own rights, and the Court will only consider the alleged harms against him. *See Massey v. Helman*, 196 F.3d 727, 739-40 (7th Cir. 1999). The Court further notes that it previously determined that Weston had not adequately stated a denial of access to courts claim for "assisting others in exercising their right of access to the court" in his Supplemental Complaint. (Doc. 57, p. 5-6) (quoting *Higgason v. Farley*, 83 F.3d 807, 810 (7th Cir. 1996)).