## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **TRAVIS WESTON,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 19-cv-01020-SPM** |
| **JOHN BALDWIN,**<br>**JAMES CLAYCOMB,**<br>**LLOYD HANNA,**<br>**HOWARD HARNER,**<br>**JACQUELINE LASHBROOK,**<br>**FRANK LAWRENCE,**<br>**ANTHONY WILLS, and**<br>**ROB JEFFREYS,**[1] | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

**MCGLYNN, District Judge:**

This matter is before the Court on a motion for summary judgment on the issue of failure to exhaust administrative remedies filed by all Defendants. (Doc. 143). Plaintiff Travis Weston has not filed a response in opposition. For the reasons set forth below, the motion for summary judgment is granted.

### BACKGROUND

Plaintiff Travis Weston, an inmate of the Illinois Department of Corrections ("IDOC") currently incarcerated at Menard Correctional Center ("Menard"), brings this action for alleged violations of his First Amendment rights pursuant to 42 U.S.C. § 1983, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and state negligence law. (Doc. 1, 49). Weston is

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), for the purposes of Counts 4 and 6, Anthony Wills is substituted for Frank Lawrence, in his official capacity as the current warden of Menard, and Rob Jeffreys is substituted for John Baldwin, in his official capacity as the current director of IDOC. (*See* Doc. 19, p. 8, 10). The Clerk is **DIRECTED** to **ADD** Wills and Jeffreys to the docket as defendants. Because Weston is proceeding on other claims against Lawrence and Baldwin in their individual capacities, they will remain as parties to this case.

a devout Muslim, and he asserts that while at Menard he has been impeded from adhering to the tenets of his faith due to the conduct of individual staff members and policies and practices implemented at the administrative level. He further alleges that there is a widespread practice of retaliation by staff against Muslim inmates, such as himself, when they complain about the conditions of their confinement. Weston is proceeding on the following counts:

**Count 1:**   First Amendment claim against Claycomb for substantially burdening Weston's practice of religion by prohibiting him from praying in accordance with his religious faith and denying him participation in religious services.

**Count 2:**   First Amendment claim against Harner and Lawrence for substantially burdening Weston's practice of religion by denying him participation in Ramadan.

**Count 3:**   First Amendment claim against Hanna, Claycomb, and Lawrence for denying Weston a diet in compliance with his religious dietary restrictions.

**Count 4:**   RLUIPA claim against Wills (in his official capacity only as Warden of Menard) for the denial of participation in religious services, participation in Ramadan, and a diet in compliance with his religious dietary restrictions by staff.

**Count 5:**   First Amendment retaliation claim against Claycomb for denying Weston participation in religious services, denying him a diet in compliance with his religious dietary restrictions, and placing him in segregation in response to Weston exercising his religious beliefs.

**Count 6:**   First Amendment claim against Baldwin, Lashbrook, and Lawrence and RLUIPA claim against Wills (in his official capacity only as Warden of Menard) and Jeffreys (in his official capacity only as Director of IDOC) for enacting, adopting, and/or enforcing policies and practices that substantially burden Weston's practice of his religion including the following:
- adorning the chapel with Christian reading material but placing Islamic reading material under lock and key;
- allotting funds for holiday celebrations for Christian inmates but denying funds for celebration of two annual feast days for Muslim inmates;
- denying religious services by conditions created by overcrowding;
- refusing to allow possession of prayer oils and siwaks;
- creating pressure on Muslim inmates to consume meals that

do not conform to tenets of their faith by denying a halal menu;

- locking down facilities during Ramadan;
- providing nutritionally inadequate meals to fasting Muslims during lockdown;
- retaliating against Muslim inmates who file lawsuits on matters related to Islam by transferring them to moot their claims and circumvent RLUIPA; and
- subjecting Muslim inmates to deprivation of Islamic related activities when they complain about the conditions of their confinement.

**Count 7:**      State law negligence claim against Claycomb, Harner, Hanna, and Lawrence for their conduct regarding Weston's religious rights.

**Count 8:**      State law negligent infliction of emotional distress claim against Claycomb, Harner, Hanna, and Lawrence.

**Count 9:**      First Amendment claim against Hanna for retaliating against Weston for filing this lawsuit.

**Count 10:**    First Amendment claim against Baldwin, Lashbrook, Lawrence, and Hanna for implementing unconstitutional practices and policies of retaliation.

**Count 12:**    State law negligence claim against Baldwin, Lashbrook, Lawrence, and Hanna regarding the retaliatory conduct of staff within their respective departments.

(Doc. 49, p. 12-13).

On May 4, 2022, Defendants filed a motion for summary judgment. (Doc. 143, 144). Along with the motion, Defendants provided Weston a Rule 56 Notice stating that he had 30 days from service to respond to the motions and that, pursuant to the Local Rules of this District, failure to file a response within the deadline may "be considered an admission of the merits of the motion." (Doc. 145, citing SDIL-LR 7.1(c)(1)). After Defendants filed their motion for summary judgment, Weston filed four motions requesting an extension of the response deadline. (Doc. 147, 149, 152, 156). The Court granted the first three motions, and the deadline to respond was set for September 21, 2022. (Doc. 154). The fourth motion was denied, and Weston was given seven additional days, until October 13, 2022, to file a response in opposition. Weston was warned again that failure to

file a response would be deemed an admission of the merits of the motion and result in dismissal of this action. (Doc. 158). Weston did not file a response to the motion, despite being advised of the consequences.

### MATERIAL FACTS AND ALLEGATIONS

During the relevant time periods alleged in the Complaint and Supplement to the Complaint, Defendants were employed in the following capacities:

- Defendant Lloyd Hanna was the Food Services Program Manager for Menard;

- Defendant James Claycomb was a chaplain at Menard;

- Defendant Howard Harner was either a chaplain or chief chaplain;

- Defendant Frank Lawrence was the Assistant Warden of Programs at Menard;

- Defendant Jacqueline Lashbrook was the Warden (Chief Administrative Officer) at Menard; and

- Defendant John Baldwin was the Director of IDOC.

Weston identifies as a devout Muslim who practices the Islamic religion. As a part of the practice of his faith, he recognizes and celebrates the month of Ramadan, where Muslims fast for 30 days and do not eat anything from sunup to sundown. As another tenet of his religious practice, he participates in Jum'ah services, which is a time of group prayer held on Fridays. The teachings of his Islamic faith also include dietary laws specifying the types of food that a Muslim is allowed to eat, known as halal, and foods that are forbidden to eat, known as haram. When a halal diet is not available, Muslims are permitted to alternatively eat a kosher diet, because the diets have similar laws intended to prevent the cross-contamination of food.

Weston allegations that Defendants' substantially burdening his practice of Islam concern his ability to participate in religious services and holidays and to adhere to a halal diet.

### I. Religious Diet

IDOC provides different menus to those in custody based on certain criteria: (1) a regular menu; (2) a vegetarian and/or vegan menu; (3) a kosher menu; (4) a lacto-ovo menu; and (5) a medical menu. Kosher and halal food items are also available for purchase by inmates at the Menard commissary.

At Menard, Weston requested and was approved for a kosher diet on April 18, 2017. (Doc. 29, p. 14). Weston testified that there are a lot of similarities between a halal and kosher diet and that there is no issue with him eating a kosher diet, instead of halal. (Doc. 144-1, p. 56, 69). He also purchases halal and kosher items from the Menard commissary. Weston testified that inmates are restricted, however, on the quantity of each item they can purchase. For instance, he could only buy two bags of cereal each time he visited the commissary. (*Id.* at p. 84, 88).

Weston believes Defendant Hanna purposefully diminished the nutritional value of the kosher trays by replacing prepackaged kosher peanut butter with boiled eggs and TVP,[2] which Weston claims were not kosher certified. (Doc. 1, p. 18; Doc. 144-1, p. 86). Because he could not eat these substituted foods, he asserts that he needed to supplement his breakfast with food items purchased from the commissary. Because there was a limit on the number of halal items he could purchase at the commissary, Weston purchased non-halal items to trade for halal items with other inmates. (Doc. 144-1, p. 84). On June 19, 2019, Weston received notice that he was being terminated from the kosher diet because he violated the terms and conditions of the kosher diet contract by purchasing non-kosher items from the commissary. (Doc. 1, p. 19; Doc. 29, p. 17). The notice informing Weston that his participation in the kosher diet had been involuntarily discontinued advised him that he could reapply to be placed on the kosher diet in 60 days. (Doc. 29, p. 17).

---

[2] TVP stands for textured vegetable protein. (Doc. 114-1, p. 78).

After filing this lawsuit, on January 10, 2020, Weston was called to the chapel, where Claycomb talked to him about renewing his kosher diet contract. (Doc. 50, p. 8; Doc. 144-1, p. 90). Weston did not sign the kosher diet contract because the new contract had a list of permitted food items that could be purchased from the commissary, and the list did not include certain halal certified products. (Doc. 144-1, p. 90-91).

## II. Religious Services and Holidays

Weston claims that on March 11, 2016, he was delivering the Khutbah during a Jum'ah service. (Doc. 144-1, p. 49). Defendant Claycomb interrupted the service and removed him from the chapel. He was delivering the Khutbah because there was not an Imam from the "outside world" to come lead the service. Weston testified that he was reciting portions of Qur'an in Arabic and believes that Claycomb felt "offended by the remark that I was saying." (*Id.*). Following the incident, Weston was placed in segregation on investigative status. He was also removed from the Jum'ah services list and could no longer attend.

To participate in Ramadan at Menard, a request must be submitted to the chaplain 45 days in advance of the holy month. (Doc. 144-1, p. 64). Weston claims he requested to participate in Ramadan services in 2017 by placing a request slip in the chaplain box. His request, however, was denied by Defendants Harner and Lloyd because request was made outside of the required timeframe. (*Id.* at p. 63-64). Weston alleges Defendant Baldwin also participated in the denial of his participation in Ramadan because he complained about it in a grievance, and Baldwin affirmed the decision not to allow Weston to participate. (*Id.* at p. 63). Weston appealed the grievance, dated June 7, 2017, to the Administrative Review Board, who rendered a final decision on September 20, 2017. (Doc. 1, p. 37). Weston testified that he has no information that Claycomb was involved in the denial of his participation in Ramadan. (Doc. 144-1, p. 66-67).

### III. Retaliation

Weston asserts that he has been retaliated against for filing this lawsuit. In December 2019, Weston received a job assignment, approving him to work in the inmate kitchen. (Doc. 50, p. 2). On his first day of employment, after working for only a few hours, he claims he was informed he was being terminated "because he had a pending lawsuit against Lloyd Hanna." (*Id.* at p. 5; Doc. 144-1, p. 36). Weston further claims Defendant Hanna made arrangements to bar him from receiving another job assignment. (Doc. 50, p. 5). Since Weston was terminated from his assignment in food services, he has not made any application for another job assignment at Menard. (Doc. 144-1, p. 103).

In his declaration, Hanna provides that he once it was determined that Weston had a pending lawsuit against him, he made a request to the placement department to remove Weston from food services and place Weston in another department, in an effort to avoid further confusion or issues between himself and Weston. (Doc. 144-2). Defendant Hanna further asserts he did not fill out an evaluation for Weston. He stated has no role in the process of Weston being evaluated for or assigned to a new job placement. (*Id.*).

### LEGAL STANDARDS

Summary judgment is proper only if the moving party can demonstrate "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *See* FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex,* 477 U.S. at 323. Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson*

*v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

**ANALYSIS**

As mentioned, Weston did not file a response to Defendants' motion. Pursuant to Federal Rule of Civil Procedure 56(e), "[i]f a party fails…to properly address another party's assertion of fact" the Court may "consider the fact undisputed for purposes of the motion." Also, under Local Rule 7.1(c), a party's "[f]ailure to timely file a response to a motion may, in the Court's discretion, be considered an admission of the merits of the motion." Thus, the Court deems Weston's failure to respond as an admission of the merits of the motions filed by Defendants. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003); *Flynn v. Sandahl*, 58 F.3d 283, 288 (7th Cir. 1995) (noting that a failure to respond constitutes an admission that there are no undisputed material facts); *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) ("[e]ven where a non-movant fails to respond to a motion for summary judgment, the movant still has to show that summary judgment is proper given the undisputed facts."). Upon review of Defendants' motion, the pleadings, and exhibits in this case, the Court finds summary judgment to be appropriate.

## I.      Denial of Participation in Religious Services and Ramadan (Counts 1, 2, 4, 5, 7, 8)

Defendants argue that there are two events alleged that occurred more than two years prior to the initial date of filing on September 18, 2019, and are barred by the statute of limitations. In Count 1, Weston alleges that when Defendant Claycomb had him removed from chapel on March 11, 2016 and taken off of the Jum'ah service list, Claycomb substantially burdened his practice of religion by prohibiting him from praying in accordance with his religious faith and denying him participation in religious services. In Count 2, Weston claims that Harner and Lawrence

substantially burdened his practice of religion by denying him participation in Ramadan in May 2017. (Doc. 144-3, p. 4). Defendants contend that these incidences also form the basis of Weston's RLUIPA, retaliation, state law negligence, and state law negligent infliction of emotional distress claims against Claycomb, Harner, and Lawrence. (Counts 4, 5, 7, 8). Therefore, those portions of Weston's claims in these other counts are also barred by the statute of limitations.

Section 1983 claims borrow the statute of limitations for personal injury torts from the state in which the alleged violation occurred. *Wilson v. Garcia,* 471 U.S. 261, 276 (1985); *Ashafa v. City of Chi.*, 146 F.3d 459, 461 (7th Cir. 1998). Illinois's applicable statute of limitations is two years. *Kalimara v. Ill. Dep't of Corr.*, 879 F.2d 276, 277 (7th Cir. 1989). Federal law, on the other hand, determines the date of accrual for calculating the two-year period. *Wilson v. Giesen,* 956 F.2d 738, 740 (7th Cir. 1992). "Generally, a claim accrues when the plaintiff knows or has reason to know of the injury giving rise to the cause of action." *Id.* "Under the continuing violation theory, however, a plaintiff may obtain relief for a time-barred act when that act is linked with the acts that fall within the statutory limitations period because the claim accrues on the date of the last injury." *Smith v. Lind,* No. 14-cv-796-slc, 2016 WL 6210688, at *4 (W.D. Wis. Oct. 24, 2016) (citing *Kovacs v. United States,* 614 F.3d 666, 676 (7th Cir. 2010)).

Finally, there are tolling requirements the Court must consider. The Seventh Circuit has stated that federal courts must toll the statute of limitations period while an inmate is exhausting his administrative grievances. *Johnson v. Rivera*, 272 F.3d 519, 522 (7th Cir. 2001). The tolling period starts when the prisoner files his grievance and ends when the administrative review process is over. *Hatch v. Briley*, 230 F. App'x 598, 599 (7th Cir. 2007).

The Court agrees that Counts 1 and 2 in their entirety and Counts 5, 7, and 8 in part against Claycomb, Harner, and Lawrence are barred by the statute of limitations. As for his allegations against Claycomb, Weston claims that Claycomb: (1) removed him from the Jum'ah service on

March 11, 2016; (2) had him placed in segregation on investigative status, where he remained for twenty-nine days; and (3) denied his subsequent requests to attend Jum'ah and Ta'aleem services. (Doc. 144-1, p. 110-111). The accrual of these claims is not entirely clear, as Weston claims he continued to be denied participation in religious services by Claycomb even after his release from segregation in April 2016. (Doc. 1, p. 16). Weston testified that after submitting multiple requests to be placed back on Jum'ah service list, he eventually "got the message" and stopped submitting requests. (Doc. 144-1, p. 111-112). He further testified that he does not recall the last time he requested to be placed on the list. Regardless, Weston does not dispute Defendants' arguments that his allegations against Claycomb regarding denial to attend religious services is barred by the statute of limitations, and the Court will treat his silence as agreement of Defendants' position. *See Wojtas v. Capital Guardian Trust Co.,* 477 F. 3d 924, at *926 (7th Cir. 2007) (failure by the plaintiffs to offer any opposition to the defendant's statute of limitations argument "constituted a waiver"). The Court further notes that there is also no evidence that Weston grieved these issues, tolling the statute of limitations. Accordingly, the Court grants summary judgment as to the following claims, finding them barred by the statute of limitations: Count 1 in its entirety; Count 5 in part against Claycomb for retaliating against Weston by denying him participation in religious services and placing him in segregation; and Counts 7 and 8 in part against Claycomb to the extent Weston asserts that Claycomb's denial of participation in religious services and retaliation constituted negligence and negligent infliction of emotional distress.

The claims against Harner and Lawrence regarding the allegation that they denied Weston participation in Ramadan in May 2017 are also time barred, even in light of evidence that Weston attempted to grieve this issue. There is no copy of the actual grievance in the record, but according to ARB records, Weston grieved that on May 27, 2017, he was denied participation in Ramadan, in a grievance dated June 7, 2017. (Doc. 1, p. 37; Doc. 144-4, p. 1). The ARB rendered a final

decision on September 20, 2017. (*Id.*). Accordingly, the statute of limitations was tolled for 105 days while Weston exhausted his administrative remedies. Assuming his claim accrued May 27, 2017,[3] Weston should have filed his lawsuit on or about September 9, 2019. He missed this deadline, however, by nine days and filed his lawsuit too late on September 18, 2019. Summary judgment is therefore granted as to Count 2 against Harner and Lawrence in its entirety and as to Counts 7 and 8 in part regarding Weston's claim that Harner and Lawrence's conduct regarding denial of participation in Ramadan was negligent and negligently inflicted emotional distress.

The Court finds that Count 4, Weston's RLUIPA claim is not barred by the statute of limitations. Defendants do not provide any law regarding the statute of limitations for RLUIPA claims, and the Court agrees with the rulings of other district courts in this Circuit that the statute of limitations for RLUIPA claims is four years, not two. 28 U.S.C. § 1658. *See Henderson v. Jess,* No. 18-cv-680-jdp, 2021 WL 1080269, at *4 (W.D. Wisc. Mar. 19, 2021) (apply 28 U.S.C. §1658 to RLUIPA claims and concluding the statute of limitations is four years); *Ghashiya v. Wisc. Dep't of Corr.,* 2007 WL 2822005, at *19 n. 25 (E.D. Wisc. Sept. 27, 2007). *See also Al–Amin v. Shear*, 325 F. App'x 190, 193 (4th Cir. 2009); *Congregation Adas Yereim v. City of New York*, 673 F. Supp. 2d 94, 107 (E.D. N.Y. 2009) ("[i]t is undisputed that the four-year catch-all federal statute of limitations, codified at 28 U.S.C. § 1658(a), governs claims brought under RLUIPA"). Thus, Weston's RLUIPA claim was timely filed.

That being said, the Court will still grant summary judgment as to Count 4, as there appears

---

[3] It is not clear the exact dates of when Weston submitted his request to participate in Ramadan and when his request was denied. In the Complaint, Weston states he complained to Lawrence about the denial issued by Harner on May 5, 2017. (Doc. 1, p. 17). Weston then alleges he received a memorandum from Lawrence denying his request for Ramadan participation on May 9, 2017. (*Id.* at p. 18). The Cumulative Counseling Summary, attached as an exhibit to the motion for summary judgment, records that on May 11, 2017, Harner documented that the request for participation was denied on April 25, 2017. (Doc. 144-3, p. 4). Weston testified that Harner received his request 30 days before Ramadan. (Doc. 144-1, p. 65). This would mean Harner received the request around April 26, 2017, as Ramadan began on May 26 in 2017. The ARB records ruling on Grievance #113-6-17 regarding "participation in Ramadan denied 5/27/17." (Doc. 144-4, p. 1). In light of these conflicting dates, the Court will view the evidence in the light reasonably most favorable to Weston and use May 27, 2017, as the accrual date.

to be no relief for the Court to provide. As stated in the Merit Review Order, "RLUIPA does not authorize a suit for money damages against defendants in their individual capacities," (Doc. 19, p. 8) (citations omitted). Under the statue, a plaintiff may only obtain injunctive and declaratory relief. *Grayson v. Schuler,* 555 F. 3d 450, 451 (7th Cir. 2012). But a "court's power to grant injunctive relief only survives if such relief is actually needed." *Nelson v. Miller*, 570 F.3d 868, 882 (7th Cir. 2009). A plaintiff is entitled to prospective injunctive relief when "there exists some cognizable danger of recurrent violation, something more than the mere possibility." *Id.* (quoting *United States v. W.T. Grant Co*., 345 U.S. 629, 633 (1953)). A theoretical possibility "supported only by speculation and not evidence" will not suffice. *Id. See also Higgason v. Farley,* 83 F. 3d. 807, 811 (7th Cir. 1996) (citing *Murphy v. Hunt,* 455 U.S. 478, 482 (1982) (applying the capable-of-repetition doctrine without discrimination between claims for declaratory relief and claims for injunctive relief).

During his deposition, Weston testified that it was Claycomb who had him removed from the Jum'ah service in 2016 and denied his subsequent requests to be placed on the list. (Doc. 144-1, p. 112). Weston further testified that Claycomb is "not over there anymore now." (*Id.*). When Weston was asked if he requested to participate in Jum'ah services after Claycomb "left," he answered, "no." (*Id.*). It is clear that Weston's claim regarding denial of religious service participation is specific to conduct on the part of Claycomb. Based on his testimony that Claycomb is no longer employed in a position at Menard in which he is authorized to grant or deny participation in religious services and given the fact that Weston has not requested to participate in religious services since 2019 at the latest, Weston's allegations do not suggest he needs prospective injunctive relief. (Doc. 144-1, p. 112-113). As such, his RLUIPA claim regarding denial to attend religious services is moot. While there is a theoretically possibility that if Weston resubmits a request to participate in Jum'ah service the request will be denied by a different

chaplain, "that possibility is supported only by speculation and not evidence." *Nelson,* 570 F. 3d at 882.

Weston's allegations regarding denial to participate in Ramadan in 2017 also do not suggest the need for prospective relief. Weston had an issue making the sign-up deadline in 2017, allegedly because Harner did not frequently retrieve Ramadan requests from the chaplain request box. (Doc. 1, p. 17). Although, Weston testified that he did not have any evidence that the requests for Ramadan were not being pick-up in a timely manner. (Doc. 144-1, p. 63). Despite the denial of his request in 2017, "he does not also allege that the signup deadline will be a problem for him in the future." *See McIntosh v. Goff,* 2021 WL 6134574, at *2 (W.D. Wisc. Dec. 29, 2021) (finding that the plaintiff failed to state a RLUIPA claim when the defendants did not accommodate his participation in Ramadan after he missed the signup deadline). Nor does Weston claim that other than that single occurrence, he has properly requested and been denied the ability to participate in Ramadan.

The Court further notes that the type of declaratory and injunctive relief sought for his RLUIPA claim is unclear. Weston testified that he is seeking injunctive relief, declaratory relief, and adequate compensation for his injuries. (Doc. 144-1, p. 117). When asked what type of injunctive relief he was wanting, Weston referred Defense Counsel to the Complaint and did not articulate any specific type of relief. (*Id.* at p. 118). In the Complaint and Supplemental Complaint, however, Weston also does not request a specific form of injunctive relief[4] or ask for declaratory judgment regarding the alleged denial of participation in religious services and holidays. (Doc. 1, p. 22, 25). Accordingly, because Weston does not "specify what type of injunctive relief he is seeking, and his allegations show that he does not need injunctive relief to prevent a similar injury

---

[4] Under Count 1 against Claycomb for denial of participation in Jum'ah services, Weston asks for the Court to award him "actual, consequential, compensatory, punitive, and any just and equitable relief this court may deem appropriate." (Doc. 1, p. 22).

from occurring in the future," summary judgment is granted as to Count 4 regarding Weston's claim he was denied participation in Ramadan and religious services. *Kyle v. Goff*, No. 20-cv-460-jdp, 2020 WL 4219838, at *1 (W.D. Wisc. July 23, 2020) (finding that the plaintiff's RLUIPA claim was moot where the plaintiff was denied participation in Ramadan on one occasion because he had missed the signup deadline).

## II.     First Amendment Free Exercise Clause/RLUIPA

Weston's ability to practice his religion is protected by the Constitution and by federal statute. The Free Exercise Clause of the First Amendment "prohibits the state from imposing a substantial burden on a central religious belief or practice," unless the burden is "reasonably related to legitimate penological interests." *Kaufman v. Pugh*, 733 F.3d 692, 696 (7th Cir. 2013). "The Supreme Court has explained that a substantial burden is one that 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Neely-Bey Tarik-El v. Conley,* 912 F. 3d 989, 1003 (7th Cir. 2019) (quoting *Thomas v. Review Bd.,* 450 U.S. 707, 718) (1981)).

The Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1(a), "offers broader protections than the First Amendment." *Williams v. Benson,* No. 21-cv-667-JPS, 2022 WL 671516, at *3 (citing *Grayson v. Schuler,* 666 F. 3d 450, 451 (7th Cir. 2012)). *See also Neely-Bey Tarik-El,* 912 F. 3d at 1004. The statute prohibits prison officials from "impos[ing] a substantial burden on the religious exercise" of an inmate "unless the government demonstrates that imposition of the burden on that person…is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000cc-1(a). *See also Grayson,* 666 F.3d at 451.

### a.  Dietary Practices (Counts 3, 4, 5, 7, 8)

Defendants argue that Weston's ability to practice his religion has not been substantially burdened, as it concerns his diet. He was approved for a kosher diet, which the Islamic faith allows

its followers to eat in the absence of a halal diet, and Weston was permitted to purchase kosher and halal items at the Menard Commissary. Defendants argue that his kosher diet was only terminated because Weston violated the terms of the contract, which must be followed in order to receive a religious diet, by purchasing non-kosher food items. There is no evidence to show that Defendants forced him to choose between his religious practice and adequate nutrition. Rather, Defendants contend it has been Weston's own actions and violations of IDOC policy that caused him to be removed from the kosher diet.

The Court agrees. "In the context of a religion's dietary requirements, a 'prisoner's religious dietary practice is substantially burdened when the prison forces him to choose between his religious practice and adequate nutrition.'" *Taylor v. Cook Cty.*, No. 11 C 7427, 2013 WL 2285806, at *7 (N.D. Ill. May 23, 2013) (quoting Nelson 570 F.3d at 879). Correctional officials are allowed to "appropriately question whether a prisoner's religiosity, asserted as the basis for a requested accommodation, is authentic." *Cutter v. Wilkinson,* 544 U.S. 709, 725 n.13 (2005). Additionally, courts have consistently held that:

> [P]rison officials can evaluate evidence of food purchases that are inconsistent with a professed religious belief and may use that information to assist in evaluating the sincerity of an inmate's religious beliefs before providing an inmate with a religious diet.

*Sharp v. Liebel,* No. 20-cv-327-JD-MGG, 2021 WL 4147036, at *6 (N.D. Ind. Sept. 13, 2021) (collecting cases).

It is not disputed that Weston's religious diet was canceled on June 17, 2019, because he purchased non-kosher food from the commissary. (Doc. 144-1, p. 87-88; Doc. 29, p. 17). Based on his purchases, it was determined that Weston lacked sincerity regarding his religious beliefs. (Doc. 29, p. 17). In the Notice to Discontinue Religious Diet, Weston was informed he could reapply to receive a kosher diet in 60 days. (*Id.*). There is no evidence in the record that Weston has reapplied to receive the kosher diet. When he was given the opportunity to resign a contract to

**Page 15 of 21**

receive a kosher diet, Weston refused because certain halal items he would like to purchase at the commissary are not on the approved list. (*See* Doc. 68, p. 16-21; Doc. 73, p. 9; Doc. 144-1, p. 91). Weston does not contend that consuming the items that are not included on the approved purchase list are necessary somehow in practicing his religious faith.

Furthermore, Weston's justification for the non-kosher purchases, that he was forced to buy and then trade non-kosher items for kosher items because the kosher breakfast tray contained non-kosher items and was nutritionally inadequate, is also not supported by any evidence in the record. There is no evidence that the TVP and boiled eggs on the breakfast tray were improperly prepared, as alleged. (Doc. 144-1, p. 69). In his declaration, Defendant Hanna, the Food Services Program Manager at Menard, states that a kosher religious diet is a prepackaged meal that is sealed and approved by the state. His supervisor, the Food Service Administrator, has advised him that boiled eggs and reconstituted TVP are approved kosher diet items. (Doc. 144-2, p. 2). No kosher diet items are cooked in the kitchen at Menard, but when an item requires heating, such as the TVP or a boiled egg, the item is heated while in the sealed packaging in specific pots and using utensils marked KOSHER and washed separately. According to Hanna, these kitchen items do not have any contact with non-kosher food items.

Weston has not offered any evidence to rebut Hanna's declaration. Weston testified that he knew that the TVP and boiled eggs were cooked in the same pots and pans as non-kosher items because he saw "how the whole operation of the kitchen worked," during the morning he was assigned to work in the kitchen. (Doc. 144-1, p. 77). He does not describe with any kind of detail, however, what he specifically witnessed regarding food preparation for the kosher trays. Weston testified that he has documents discussing how the boiled eggs should be prepared to comply with halal requirements but such documents are not in the record. (*Id.*). Notably, Wesont was not assigned to work in the kitchen until after he filed this lawsuit. He first grieved that he believed

the TVP and boiled eggs were not kosher certified in August 2018, his religious diet was canceled in June 2019, and he was not assigned to work in the kitchen until several months later in December 2019. (*See* Doc. 29, p. 3, 17).

Weston also testified that he learned the TVP and boiled eggs were not being prepared properly from other inmates who worked in the kitchen. (Doc. 144-1, p. 70). But the only affidavit in the record is from an inmate, Jonathan Tolliver, who began working in the kitchen on September 19, 2019, also months after Weston's religious diet was canceled. (Doc. 68, p. 3-7). In his affidavit, Tolliver discusses the uncleanly conditions of the kitchen and the lack of supervision of the inmate kitchen staff by the food supervisors. Tolliver does not state that he witnessed kosher items being prepared in non-kosher designated pots and pans. Thus, there is no evidence that the breakfast tray contained non-kosher items, and no reasonable fact finder could conclude that Weston was forced by Defendants to choose between his religious practice and adequate nutrition. For these reasons, summary judgment is granted as to Count 3 in its entirety against Hanna, Claycomb, and Lawrence and as to Counts 4, 5, 7, and 8 in part.

### b. Policies and Practices (Count 6)

In his Complaint, Weston alleges that Baldwin, Lashbrook, and Lawrence ratified, implemented, and pursued policies and practices that substantially burdened his ability to practice his religion, such practices included the following:

- adorning the chapel with Christian reading material but placing Islamic reading material under lock and key;
- allotting funds for holiday celebrations for Christian inmates but denying funds for celebration of two annual feast days for Muslim inmates;
- denying religious services by conditions created by overcrowding;
- refusing to allow possession of prayer oils and siwaks;
- creating pressure on Muslim inmates to consume meals that do not conform to tenets of their faith by denying a halal menu;
- locking down facilities during Ramadan;

Page 17 of 21

- providing nutritionally inadequate meals to fasting Muslims during lockdown;
- retaliating against Muslim inmates who file lawsuits on matters related to Islam by transferring them to moot their claims and circumvent RLUIPA; and
- subjecting Muslim inmates to deprivation of Islamic related activities when they complain about the conditions of their confinement.

(Doc. 1, p. 27). Defendants argue that Weston has failed to provide any evidence to support this claim. He has not demonstrated that any of the alleged conduct which he claims violated his constitutional rights occurred at the direction of Baldwin, Lashbrook, or Lawrence or that they were personally involved in the violation of his constitutional rights. Neither has he presented evidence directly connecting Defendants to the alleged policies.

Defendants are entitled to summary judgment as to Count 6. In his deposition, Weston stated he was suing Director Baldwin and Warden Lashbrook because they were "in charge." (Doc. 144-1, p. 46-47). When asked about why Weston was suing Assistant Warden Lawrence, he stated because of Lawrence's direct involvement in "one of the counts" and his "supervisory authority as well." (*Id.* at p. 47). Other than these statements, there is no other evidence connecting Defendants to any of the policies mentioned in the Complaint. An individual cannot be held liable under Section 1983 merely based on their supervisory role under a theory of *respondeat superior* or vicarious liability. *Lennon v. City of Carmel, Indiana*, 865 F.3d 503, 507–08 (7th Cir. 2017) ("[T]here is no vicarious liability in a suit under section 1983."); *T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010) ("[T]here is no theory of respondeat superior for constitutional torts.") (citation omitted). As such, summary judgment is granted as the First Amendment claim in Count 6.

As to the RLUIPA claim, Weston has not met his burden of demonstrating how any of the practices alleged substantially burdened his sincere religious exercise. (Doc. 144-1, p. 93-100). Neither has he shown that he is being subjected to ongoing or impending harm warranting injunctive or declaratory relief. *See Swanigan v. City of Chicago,* 881 F. 3d 577, 583 (7th Cir.

Page 18 of 21

2018) (a plaintiff seeking injunctive relief "has standing to sue for an alleged future injury only if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur.") (internal quotations and citations omitted). Thus, summary judgment is granted as to the RLUIPA claim in Count 6.

### III. Retaliation

"An act taken in retaliation for the exercise of a constitutionally protected right violates the Constitution." *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000). An inmate has a First Amendment right to file grievances and lawsuits. *Id.*; *Watkins v. Kasper,* 599 F.3d 791, 798 (7th Cir. 2010). In order to prevail on a claim of retaliation, a plaintiff must show that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." *Hawkins v. Mitchell,* 756 F.3d 983, 996 (7th Cir. 2014) (citations omitted). Thus, the plaintiff must set forth a chronology of events and show that his litigation activities were a motivating factor for an adverse action. *DeWalt,* 224 F.3d at 618. In this context, an adverse action is one that would chill or deter a person of ordinary firmness from exercising a First Amendment right. *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir. 1982). Once the plaintiff meets his burden, the burden shifts to Defendants to show that the harm would have occurred anyway, even without the retaliatory motive. *Greene v. Doruff,* 660 F.3d 975, 979 (7th Cir. 2011).

#### a. Hanna (Count 9)

In Count 9, Weston claims that Hannah retaliated against him for filing this lawsuit by terminating him from his job in food services and then prevented him from receiving further employment. (Doc. 50, p. 5). Defendants do not dispute that filing this lawsuit is protected First Amendment activity or that Weston suffered a deprivation when he was removed from employment in the food services department. Citing to *Holleman v. Zatecky,* Defendants contend

that Weston has not presented any evidence creating an issue of fact regarding whether Hanna's conduct was motivated by the protected conduct. 951, F. 3d 873, 878 (7th Cir. 2020). In *Holleman*, the plaintiff was transferred to a new correctional facility after speaking to the media, and filing multiple grievances, complaints, and letters about the conditions of the previous correctional facility in which he was housed. *Id.* The superintendent of the facility asked for the plaintiff to be transfers as solution to plaintiff's issues. In finding that the superintendent did not act with a retaliatory motive, the Seventh Circuit distinguished between:

> [A] transfer motivated by the *fact* that the inmate sued and one motivated by the *nature* of the dispute underlying the lawsuit, even though both would be directly caused by the prisoner's protective activity. In other words, a transfer initiated to punish a prisoner for engaging in protected activity would satisfy the causation element of retaliation, but a transfer initiated as a rational, justifiable response to the substance of the prisoner's complaint would not.

*Id.* at 878-879 (citations omitted). Based on this reasoning, Defendants argue that Hanna did not ask for Weston to be reassigned due to the *fact* he filed a lawsuit or to punish him for doing so but to avoid any further conflict or confusion with Weston. They further point out that there is no evidence that Hanna prevented Weston from obtaining any other job at Menard.

As Weston has not presented any evidence opposing Hanna's non-retaliatory justification that he requested for Weston to be removed from food services and reassigned to a different department as a response to this lawsuit in order to avoid further conflict or confusion, the Court grants summary judgment as to Count 9.

### b. Widespread Retaliatory Practices and Policies against Baldwin, Lashbrook, Lawrence, and Hanna (Counts 10 and 12)

Likewise, there is no evidence on the record that Baldwin, Lashbrook, Lawrence, or Hanna had any part in retaliating against Weston or implementing or condoning practices of retaliation against Muslim inmates who file lawsuits and grievances. (*See* Doc. 50, p. 11-12). Weston has not even presented any evidence to raise a question of fact regarding his allegation that he was

retaliated against in the first place. Thus, summary judgment is granted as to Counts 10 and 12.

DISPOSITION

For the reasons provided, the Court **GRANTS** the motion for summary judgment filed by Defendants Baldwin, Claycomb, Hanna, Harner, Lashbrook, Lawrence, Wills, and Jeffreys. (Doc. 143).

Accordingly, this case is **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants and against Plaintiff Weston and to close this case.

The Clerk is further **DIRECTED** to modify the docket in accordance with footnote 1.

**IT IS SO ORDERED.**

**DATED:   December 5, 2022**

                                                        _s/Stephen McGlynn_____
                                                        **STEPHEN P. MCGLYNN**
                                                        **United States District Judge**